**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **CEDRIC WARREN,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNIFIED GOVERNMENT OF WYANDOTTE COUNTY AND KANSAS CITY, KANSAS, et al.,**<br><br>**Defendants.** | **Case No. 25-2625-JAR-RES** |

**MEMORANDUM AND ORDER**

Plaintiff Cedric Warren filed this action on October 30, 2025, alleging claims under 42 U.S.C. § 1983 and Kansas law against the following Defendants: Unified Government of Wyandotte County and Kansas City, Kansas ("Unified Government"); Daphne Halderman, Special Administrator of the Estate of Captain Roger Golubski ("Golubski"); Detective Bryan Block; Detective Darren Koberlein; Detective Randy Slater; Detective Dion Dundovich; and Captain Bill Howard, Jr., all in their individual capacities. Before the Court is Defendant Golubski's Motion to Dismiss for Failure to State a Claim (Doc. 57). The motion has been fully briefed, and the Court is prepared to rule. For the reasons stated below, Defendant's motion to dismiss is granted in part and denied in part.

## I. Standard

Fed. R. Civ. P. 12(b)(6) provides for dismissal for failure to state a claim upon which relief can be granted. To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above

the speculative level"[1] and include "enough facts to state a claim to relief that is plausible on its face."[2] The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires more than "a sheer possibility."[3]

"[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[4] The Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[5] The Court will view all well-pleaded factual allegations in the light most favorable to the plaintiff.[6]

Plaintiff alleges ten claims[7] in his Amended Complaint: (1) deprivation of liberty without due process of law and denial of fair trial by fabricating evidence, withholding material exculpatory and impeachment evidence, and deliberately failing to conduct a constitutionally adequate investigation in violation of the Fourth and Fourteenth Amendments; (2) malicious prosecution in violation of the Fourth and Fourteenth Amendments; (3) failure to intervene; (4) civil rights conspiracy; (5) supervisory liability claim; (6) unconstitutional customs, policies, and practices of Defendant Unified Government; (7) malicious prosecution under Kansas law; (8) intentional or reckless infliction of emotional distress under Kansas law; (9) negligent infliction

---

[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[2] *Id.* at 570.

[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[5] *Iqbal*, 556 U.S. at 678.

[6] *Jordan-Arapahoe, LLP v. Bd. of Cnty. Comm'rs of Cnty. of Arapahoe, Colo.*, 633 F.3d 1022, 1025 (10th Cir. 2011).

[7] Not all of Plaintiff's claims are brought against every Defendant. The Court makes clear in the Discussion section which claims are alleged against Golubski.

of emotional distress under Kansas law; and (10) respondeat superior liability. Defendant Golubski moves to dismiss all claims brought against his estate under Fed. R. Civ. P. 12(b)(6).

## II. Background

The following facts are alleged in the First Amended Complaint[8] and assumed to be true for purposes of deciding the instant motion.

In October 2010, Cedric Warren and Domonique Moore[9] were convicted in Wyandotte County District Court for the February 13, 2009 murders of Charles Ford ("Charles") and Larry LeDoux and the attempted murder of Brandon Ford ("Brandon"). Warren was sentenced to life imprisonment with a mandatory minimum of 50 years for first degree murder. On December 9, 2024, the Wyandotte County District Court granted Warren's petition for habeas relief under K.S.A. § 60-1507 and vacated his convictions. Two days later, on December 11, 2024, the State of Kansas dismissed all charges against Warren. In total, Warren spent 15 years, 9 months, and 25 days incarcerated for crimes he did not commit. He was 18 years' old at the time of his arrest.

***The February 13, 2009 Shooting***

On the evening of February 13, 2009, Charles, LeDoux, and Brandon were staying in a known drug-house at 3719 Webster Street, Kansas City, Kansas ("3719 Webster"). Charles and Brandon were brothers, and LeDoux was their brother-in-law. Deshawn Bryant was the owner of 3719 Webster and cousins with Charles, Brandon, and LeDoux, but he was out of town that night. That evening, Charles and LeDoux were armed with a loaded 9mm Glock and a loaded AK-57, respectively. With them at 3719 Webster: a kilo of cocaine and $20,000 cash.

---

[8] Doc. 51.

[9] The Court notes Moore is the plaintiff in a nearly identical lawsuit arising from the same underlying wrongful conviction as Warren. *See Moore v. Unified Gov. of Wyandotte Cnty., et. al.*, Case No. 2:25-cv-02626-JAR-RES (D. Kan. 2025).

Just before midnight, gunmen entered 3719 Webster. Immediately thereafter, Charles and LeDoux exchanged gunfire with the shooters. After the gunfire cleared, Brandon observed the gunmen fleeing 3719 Webster and entering a black SUV. Brandon then fled 3719 Webster with a gun in hand himself. Brandon began alerting neighbors for help; two neighbors dialed 9-1-1. One neighbor reported hearing gunshots and reported a black man with a gun came to his door saying someone was shooting at him; another neighbor reported that someone came to their house seeking help because he had been shot at. No neighbors reported seeing a black SUV or anyone other than Brandon with a gun. Charles and LeDoux died at the scene.

***Brandon's Initial Statements to the Police***

Brandon provided to the Kansas City, Kansas Police Department ("KCKPD") various statements concerning the shooting. Brandon's statements were rife with contradictions and provided at the behest and coercion of KCKPD detectives. Brandon's initial statements regarding the February 13, 2009 shooting are detailed chronologically below.

At 11:57 p.m., Brandon provided the police with his first statement. Four minutes after the first emergency call to the police, KCKPD officers found Brandon a few blocks from 3719 Webster. There, Brandon told the responding officers that his name was "Joseph Ford," and that he was scared because "guns had gone off."[10] Brandon told the responding officers that a friend had taken him to McDonald's and had just dropped him off at 3719 Webster when people started shooting at him as he approached the house.

Shortly after midnight, Brandon provided the police with his second statement. This time, the responding officers brought Brandon to their squad car, where a different officer interviewed him. In this interview, Brandon admitted he was "Brandon Ford" and not "Joseph."

[10] Doc. 51 ¶ 57.

Brandon then admitted to being inside 3719 Webster at the time of the shooting. However, Brandon said he was unable to provide a description of the shooters because he was in the bathroom at the time of the shooting and never saw the shooters. At the instruction of the responding officers, Brandon remained in the squad car until the detectives-in-charge arrived. Homicide Detectives Darren Koberlein and Bryan Block were assigned to the case and arrived on scene before 1:00 a.m. on February 14, 2009.

Sometime between midnight and 2:17 a.m., Brandon provided Koberlein and Block with his third statement. According to a police report authored by Block, Brandon told Koberlein that he was inside 3719 Webster with Charles and LeDoux when a black SUV pulled up to the house and two unknown individuals got out. Brandon went to the bathroom when Charles opened the door. From the bathroom, Brandon heard someone shouting, "where is the shit," trailed by the sound of gunshots.[11] Brandon then ran to a nearby bedroom, shut the door behind him, grabbed a gun hidden in that room, and exchanged gunfire through the closed bedroom door with the gunmen.

According to Block's report, Brandon provided to Koberlein the following descriptions of the gunmen: (1) a guy with short hair and dark complexion, and (2) a guy with brownish complexion wearing braids. Neither Block nor Koberlein reported any additional descriptions by Brandon. Despite Brandon's insistence that he did not know who the shooters were and could not provide any additional description, Koberlein and Block transported Brandon to the KCKPD police station and interrogated him the entire next day until Brandon's release on the evening of February 14, 2009.

---

[11] *Id.* ¶ 61.

***Roger Golubski Arrives On Scene***

Around 1:21 a.m. on February 14, 2009, Captain Roger Golubski arrived at 3719 Webster. Golubski took command of the scene and remained the supervisor throughout the investigation. As supervisor, Golubski reviewed and signed the investigating detectives' reports, initialing each page during his review. It was Golubski who first input Warren's name into the investigation.

On the early morning of February 14, 2009, Golubski directed his detectives to focus their investigation on Warren as the main suspect of the shooting. No other detective had yet mentioned Warren as a suspect. Prior to the shooting, Warren's mother, Kathy Warren, rejected Golubski's solicitation for sex. She informed Warren's father of Golubski's sexual advances, who subsequently threatened Golubski to stay away from his family. However, Golubski instead sought to exact revenge against the Warrens for their defiance. The shooting offered Golubski an opening for this revenge, and he took it: he pinned the double-homicide and attempted murder on then-18-year-old Warren.

Golubski's framing of Warren was consistent with Golubski's storied abuse that was well-known throughout the KCKPD. KCKPD officers and supervisors knew Golubski was a serial sexual predator and dirty cop who spent decades openly leveraging the power of his badge to threaten, abuse, and prey on the Kansas City, Kansas community, with a particular focus on terrorizing Black women and girls. In fact, the KCKPD squad room openly joked about the many rumored children Golubski fathered throughout Kansas City, Kansas during his decades of openly using the job to feed his predilections.

Indeed, Golubski would arrest many of these women and force them to perform sexual acts for him at the KCKPD precinct, then release them without ever filing charges. In other

instances, he would leverage his power as a KCKPD detective to fix tickets and vanish warrants in exchange for sex. And while Golubski would occasionally pay off his victims with drugs or money, his favored currency was compulsion.

Moreover, Golubski was well-known for utilizing a network of unreliable informants to manufacture cases and convictions. Many of Golubski's informants stemmed from his relationships with drug kingpins and dealers, who paid Golubski for protection and information on searches, informants, and ongoing investigations. KCKPD officers and supervisors knew Golubski would routinely abuse his power to clear warrants for his informants and to receive sexual favors.

However, the KCKPD did not welcome reports or complaints about its officers, and the KCKPD never investigated Golubski or his subordinate officers for any of the rampant misconduct that they regularly engaged in for decades. After Golubski retired, several current and former KCKPD officers blew the whistle on his gross misconduct. Multiple KCKPD officers have given sworn statements and provided testimony under oath describing Golubski's exploitation of vulnerable Black women, girls, and their families, and KCKPD's permissive or collusive supervision that allowed him to openly continue his abuse throughout his career.

KCKPD officers and supervisors knew the information provided by Golubski and his network was unreliable. But KCKPD officers and supervisors also knew that if they had a tough case, they could ask Golubski for information because he would coerce his network of informants to say anything, regardless of truth. And in fact, they did. Golubski and his officers openly closed cases via whatever means available, expending little to no time or effort in search of a crime's real perpetrator. As a result, Golubski rose through the ranks of the KCKPD,

stacking promotions, never reprimanded, punished, or investigated by the KCKPD for his abuse and corruption.

***Detectives Target Warren***

At Golubski's direction, detectives now focused their investigation on Warren and an unknown man in a red shirt. On February 14, 2009, the only information Brandon provided the detectives with was that there were two shooters: one with short hair and a dark complexion, and the other with braids and a brownish complexion. Detectives possessed no other information or leads at that time.

Yet, later that morning, at 11:30 a.m., KCKPD Detective Dion Dundovich reported that Block had informed him that two suspects had been identified: Warren and an unknown male in a red shirt with medium dark skin, close cropped hair, and hair on his chin. At this point in the investigation, KCKPD detectives had no evidence linking the shooting to Warren or the unknown man in a red shirt. Indeed, Brandon had not yet mentioned Warren by name, alias, or description, nor had Brandon described any other individual in a red shirt with hair on his chin.

Dundovich reported that he attempted to locate Warren via phone tracking and coordination with the Kansas City, Missouri Police Department in an area Warren was allegedly last seen, and that this effort resulted in officers locating Warren at a house at 2025 Lawn Avenue. However, Dundovich's report was a lie. Instead, KCKPD officers located Warren at 2025 Lawn Avenue due to information from one of Golubski's informants: Tracy Mays, the owner of 2025 Lawn Avenue. Dundovich made the false report to conceal that the information originated from a Golubski informant and not Brandon. Dundovich's supervisor, Captain Bill Howard Jr., reviewed, approved, and signed the false report.

On the night of February 13, 2009, various groups of children, teenagers, and adults were gathered at 2025 Lawn Avenue. 2025 Lawn Avenue was a well-known get-together spot in its neighborhood. People of all ages gathered, and police often surveilled the house for this reason. That night, many of the people hanging out at 2025 Lawn Avenue slept there until the next morning, including Warren and Moore. Warren spent the night with his friend, Damian, who was Mays's son. Moore spent the night with his then-girlfriend, who was Mays's niece; Moore was wearing a red shirt during his visit.

Despite locating Warren, the KCKPD had zero evidence connecting Warren or this unidentified man in a red shirt to the shooting, so they did not make an arrest at that time. Instead, Block and Koberlein returned to Brandon for information.

***Brandon's Fourth Statement to the Police***

Around 1:52 p.m. on February 14, 2009, Block and Koberlein sought a more detailed, fourth statement from Brandon. In a recorded interview, nearly 12 hours after they first began interrogating him, Brandon described, for the first time, the assailants as: (1) a Black, brown-skinned, short male with a short fade and goatee, wearing a red shirt, blue jeans, and a red jacket, holding a gun; and (2) a man with braids wearing a striped jacket and holding a handgun. Block also reported Brandon identified the man in the striped jacket as possibly being named, "Ced," as Brandon knew him from the neighborhood near 61st and Farrow.

Block's report was a lie. Block and Koberlein fed Brandon false descriptions of the gunmen, including the name "Ced," and pressured Brandon into regurgitating their false account. Warren's nickname to family and friends was actually "Bobo," and Warren had never lived near 61st and Farrow. Brandon parroted the detectives down to their argot. For example, in his statement, Brandon referred to Charles and LeDoux, *his brothers*, as the "deceased parties."

Golubski reviewed, approved, and signed Block's report detailing these lies. Notably, Brandon gave his fourth statement hours *after* Block and Koberlein had already advised Dundovich of Warren and the man in a red shirt.

At some point later that same afternoon, detectives showed Brandon a photo array that included Warren. The array didn't include any other individuals with names like "Ced," and, although KCKPD officers reported that Brandon allegedly described one of the shooters as having braids, only two of the photos contained an individual with braids. Block reported that he put Warren's photo in the array due to his familiarity with Warren and his associates. This was another lie; Block included Warren's photo at Golubski's directive.

After hours of direct pressure and coercion, Brandon identified Warren as the man in the striped jacket. Even further, Koberlein correspondingly reported in the arrest warrant affidavit for Warren that Brandon identified Warren's voice as the person who allegedly said, "where is the shit."[12] This was another lie. Brandon never told anyone that he recognized the voice of an assailant, nor did he ever identify the voice as Warren's.

Finally, Block also falsely reported that Warren had a motive for the shooting. Block reported that Brandon said Charles and "Ced" may have had a little falling out. But Brandon never volunteered this information to the detectives, because this information did not exist. Warren did not know the Ford brothers well, nor did he ever have a "falling out" or "feuding relationship" with Charles.[13] Nonetheless, Block and Koberlein grafted this lie into a search warrant application that stated Brandon had revealed a "feuding relationship" between Charles and a man known to Brandon as "Ced."[14]

---

[12] *Id.* ¶ 61.

[13] *Id.* ¶ 114.

[14] *Id.* ¶ 113.

***The KCKPD Arrest Warren and Moore***

On February 14, 2009, within 24 hours of the shooting, KCKPD officers arrested Warren and Moore. Block and Koberlein were on scene at 2025 Lawn Avenue. Block spoke alone to some of the individuals who were at the house, including Warren's friend, Damian. Block did not document these interviews. KCKPD officers first arrested Warren and then arrested Moore later the same day. At the time of his arrest, Moore was using a cane to walk and was wearing a red shirt and a black jacket (not a red jacket).

After arresting Warren and Moore, Block asked Detective Randy Slater to create a photo lineup that included a photo of Moore to show to Brandon. Slater did so and presented Brandon with a photo array of six black and white photos, one being of Moore. Due to suggestion and pressure, Brandon stated he might recognize the photo of Moore, but that he'd need a more recent photo of the individual. Slater replaced the black and white photo of Moore with a recent color photo of Moore wearing a red shirt. Slater did not replace the other original five photos that were still black and white. It was at this point Brandon finally identified Moore as one of the shooters.

After concluding the photo array, Slater led Brandon to his workstation where he had intentionally left the recent color photo of Moore on his computer screen, in plain view of Brandon. Slater did this to emphasize for Brandon that Moore was the "correct" suspect that the KCKPD intended Brandon to identify.[15] Slater would falsely report that leaving Moore's photo on the screen was an accident and he wasn't even sure if Brandon noticed it.

[15] *Id.* ¶ 122.

***Brandon's Mental Health***

After 20 hours, the detectives no longer needed Brandon at the station. And during their time with Brandon, the detectives knew Brandon clearly suffered from severe mental health problems and needed medical care and treatment. As such, Block transported Brandon from the police station directly to Rainbow Mental Health Facility so Brandon could receive crisis psychiatric treatment. No one with the KCKPD ever informed the prosecutor that detectives delivered Brandon to a mental health facility less than 24 hours after the shooting; the prosecutor, defense attorneys for Warren and Moore, and the jury never learned of Brandon's mental health treatment and psychiatric history.

After arriving at the mental health facility, the medical staff assessed Brandon for emergency admission, observing Brandon's confusion, paranoia, and cognitive impairment. Medical notes from Brandon's intake detail that he was paranoid, easily distracted, anxiety laden, had impaired judgment and very poor insight, and was not considered to be a very reliable historian. And the admission record notes his long-time diagnosis of schizophrenia and chronic paranoia. Brandon was unmedicated at this time.

Over the next several weeks, Brandon told Rainbow Mental Health staff that he felt guilt over his brothers' deaths and that the gunmen who killed Charles and LeDoux were unknown. However, these statements were never shared with the prosecution or the defense because KCKPD officers never documented or disclosed that Brandon had been admitted to the facility. In fact, Block and Koberlein suppressed their multiple visits and calls with Brandon while he was a patient. For example, three days after detectives interrogated Brandon for 20 hours, Block and Koberlein spoke with Brandon on the phone about the homicide and visited him at the

facility. During these conversations, Block and Koberlein told Brandon they felt his safety was in danger.

KCKPD detectives hid their visits with Brandon from the prosecutor during the days and months after the shooting and before Warren and Moore's trial. And during this time period, Brandon's mental health crisis intensified. In 2009—after the shooting but before Warren and Moore's trial—Brandon was arrested on drug charges and faced a second court-ordered competency evaluation. While Brandon was in Wyandotte County Jail for this arrest, and before and during Warren and Moore's trial, Brandon admitted to other incarcerated individuals that he had no idea who the shooters from the February 13, 2009 shooting were. In fact, Brandon admitted to one person that he only identified the suspects because of police coercion and said that an officer showed him a photo and told him that somebody needed to pay for the shooting. Brandon also told another incarcerated person that he never saw the shooters and couldn't even distinguish faces at the time of the shooting because he was so high. Neither the prosecution nor the defense learned of this information before or during the trial.

***The Post-Arrest Investigation***

After arresting Warren and Moore, the KCKPD either deliberately failed to investigate further or deliberately buried exculpatory evidence that they discovered. Despite knowing Brandon suffered from severe mental illnesses and only provided statements at their coercion, the KCKPD failed to meaningfully investigate further. And importantly, KCKPD officers failed to document many basic investigative steps; for example, detectives never documented any efforts to search for the black SUV, guns, money, or drugs.

Brandon's brother, Joe Ford ("Joe"), reported to KCKPD officers that Brandon had recognized the shooters' black SUV as belonging to their cousin, Joe Freeman. Joe also reported

that Brandon mentioned that Freeman told him he planned to "kill" Brandon's brothers just days before the shooting.[16] Yet the police never documented an investigation into Freeman and never even reported locating or interviewing him.

At the scene, KCKPD officers discovered around $950.00 in LeDoux's pocket and found a black bag that contained a small amount of cocaine hidden inside of a clothes dryer. But no officer ever reported locating the bag of $20,000 or kilo of cocaine that was allegedly stored at 3719 Webster. And while KCKPD officers recovered multiple gun magazines and ammunition at 3719 Webster, they never found guns in the house; they did find a gun on the porch but never connected this gun to the shooting. In fact, no one with KCKPD ever even documented searching for the 9mm Glock and AK-57 that Charles and LeDoux reportedly possessed.

Nor did any KCKPD officer ever seek any search warrants for Warren's and Moore's homes. They never took statements or documented interviews of the other individuals who were at 2025 Lawn Avenue on the night of the shooting or the morning after. And while Block spoke to some of these individuals, he did not take their statements or document his conversations. No officer ever even documented a list of individuals who were at 2025 Lawn Avenue on the night of and morning after the shooting.

Glaringly, KCKPD detectives never documented investigating how Brandon could have seen Moore running to the black SUV despite knowing Moore's gait was so impaired that he needed a cane to walk. And, the KCKPD never reported investigating whether Brandon noticed a shooter as having noticeable facial injuries and marks, as Warren did at the time of the shooting. KCKPD did not take these basic investigative steps, because they knew all of their

[16] *Id.* ¶ 138.

information came from Golubski, not Brandon, and that they were seeking facts to support Golubski's narrative.

KCKPD also failed to take basic forensic measures. KCKPD officers and analysts only obtained DNA samples from Charles, LeDoux, Brandon, Warren, and Moore—no one else, not even Freeman. Further, the KCKPD never tested the majority of Warren's and Moore's clothing for blood or gunshot residue, despite arresting them only a day after the shooting (and with Moore seemingly in the same red shirt). And the clothing they did test was exculpatory: KCKPD tested Warren's and Moore's shoes for traces of blood, finding none.

In fact, Moore requested the KCKPD test the rest of his clothing as well, and a KCKPD Crime Scene Investigation Officer even recommended granting Moore's request. But they never did. The KCKPD also collected numerous hats and articles of clothing from 3719 Webster, but decided to only test a single hat, which failed to identify any traces of blood or DNA of Warren and Moore.

***Warren and Moore are Tried and Sentenced***

On October 12, 2010, Warren and Moore's joint trial began. Despite Brandon's distressed testimony at the preliminary hearings, which included Brandon's shaking and repeated vomiting between answers, the prosecution was still unaware of Brandon's mental health history and proceeded to trial. The prosecution's case rested entirely on Brandon's testimony. As the prosecutor explained to the jury: "The real question for you is, who did it? And to answer that question, you have to believe the testimony of Brandon. . . . Do you believe [Brandon] when he says the shooters that day were [Warren and Moore]?"[17]

---

[17] *Id.* ¶ 156.

Brandon identified Warren and Moore to the jury. But in doing so, he presented an entirely new narrative of what happened on the night of February 13, 2009. For the first time, Brandon told the jury he was sitting on the living room couch when the shooters entered 3719 Webster, not in the bathroom, not walking up the front steps, and not shooting through a closed bedroom door.

And while the State acknowledged Brandon's inconsistencies, the State asked the jury to nonetheless believe Brandon because he never wavered on the identities of the shooters, including when he provided statements to the detectives. The State evidenced Brandon's reliability by referencing Brandon's consistent identifications of Warren and Moore and statements about a man named "Ced." The State also asked the jury to rely on Brandon's fabricated voice identification of Warren.

Finally, the State's only other evidence against Warren and Moore was that a gun reportedly used in the shooting was found in an airduct at 2025 Lawn Avenue. However, the State's DNA expert testified that the DNA from the grip of that gun was consistent with a mixture of at least two individuals: the partial DNA profile was consistent with markers present in the DNA profile of 1 in every 31 people in the Caucasian population, and 1 in every 43 people in the Black population, which included Moore. The State's expert admitted the DNA was low in quantity and poor in quality. Further, Warren's father and stepmother testified that Warren was with them the night of the shooting. Warren's father testified that, at the time of the shooting, he was driving Warren to a sleepover at 2025 Lawn Avenue, which was more than 12 miles from 3719 Webster.

Warren and Moore were found guilty on two counts of murder and one count of attempted murder. Both were sentenced to life imprisonment with a hard 50 years for the first-

degree murder conviction. Moore received sentences of 195 months and 155 months on the second-degree murder and attempted murder counts, to run concurrently. Warren received two 155-month sentences on the other two counts, also to run concurrently. After several appeals to the Kansas Supreme Court, Warren and Moore were re-sentenced to 25 years on the first-degree murder convictions, with their lesser convictions to run concurrently.

***Convictions Vacated***

In July 2024, the Wyandotte County District Court conducted an evidentiary hearing on Warren's habeas petition. The court heard evidence in support of Warren's constitutional claim that the State withheld material information related to Brandon. The State chose not to present any evidence in response.

On December 9, 2024, the court granted Warren's habeas petition and vacated his convictions. In its written Order, the court emphasized that "[Brandon's] credibility in front of the jury was everything" to the State's case, concluding that "[a]gainst all odds, the jury found [Brandon] credible enough" for a conviction, but that the court had "no doubt that the disclosure" of Brandon's health records would have resulted in a different verdict.[18] The court noted that "[h]ad the evidence of [Brandon's] severe mental health deficiencies been turned over," the State may not have chosen to prosecute at all.[19] Two days after vacating Warren's convictions, the court also vacated Moore's convictions. In the end, Warren and Moore regained their freedom after enduring 15 years, 9 months, and 25 days of incarceration for crimes they did not commit.

[18] *Id.* ¶ 174.

[19] *Id.* ¶ 175.

## III. Discussion

The Court now considers Golubski's motion to dismiss Counts I–IV and VII–IX under Fed. R. Civ. P. 12(b)(6). First, the Court addresses Golubski's qualified immunity defenses. Second, and finally, the Court addresses Plaintiff's state-law claims that Golubski moves to dismiss.

### A. 42 U.S.C. § 1983 Individual-Capacity Claims and Qualified Immunity Defenses

Golubski raises the defense of qualified immunity against Plaintiff's § 1983 claims (Counts I–IV). Golubski argues Plaintiff failed to adequately plead specific actions taken by Golubski that violated his clearly established constitutional rights, thus entitling him to qualified immunity. The Court addresses each claim in turn.

A plaintiff may bring a civil cause of action under 42 U.S.C. § 1983, which requires "(1) deprivation of a federally protected right by (2) an actor acting under color of state law."[20] Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.[21] To this end, qualified immunity shields government officials from individual liability unless the plaintiff shows (1) the defendant's violation of a constitutional right; and (2) that the right the official violated was "clearly established" at the time of the challenged conduct.[22]

---

[20] *Doe ex rel. Doe v. Rocky Mountain Classical Acad.*, 99 F.4th 1256, 1259 (10th Cir. 2024) (quoting *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016)).

[21] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

[22] *Id.* at 735.

Accordingly, the qualified immunity defense must be resolved "at the earliest possible stage of a litigation."[23] For a court to resolve the issue of qualified immunity at the earliest possible stage of litigation, the complaint must allege enough facts to make clear the grounds on which the claim rests.[24] Once a defendant has "asserted the defense of qualified immunity, the burden is on [p]laintiffs to establish their right to proceed."[25] If a plaintiff fails to carry that burden, "the defendant prevails on the defense."[26]

The procedural posture of the Court's qualified immunity examination is critical.[27] At the motion to dismiss stage, defendants are subjected to "a more challenging standard of review" than would apply at the summary judgment stage.[28] On a motion to dismiss, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for [constitutionality]."[29] As such, a qualified immunity defense asserted in a Rule 12(b)(6) motion to dismiss generally presents two questions: 1) whether the plaintiff has alleged facts showing a constitutional violation; and 2) whether that constitutional violation was clearly established or obvious at the time of the incident in question.[30] The Court applies this framework below to the claims and defenses at issue in the motion to dismiss.

---

[23] *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987)).

[24] *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007)).

[25] *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018); *Bledsoe v. Carreno*, 53 F.4th 589, 617 n.25 (10th Cir. 2022) ("Appellants are correct that once they asserted qualified immunity in the district court, which they did here, it was [plaintiff's] burden to show both that he had alleged a constitutional violation and that that violation was clearly established.").

[26] *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016).

[27] *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022).

[28] *Id.*

[29] *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

[30] *See VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1159, 1175 (10th Cir. 2021).

**1. Due Process Claim (Count I)**

Golubski argues Plaintiff fails to adequately allege his due process claim, entitling him to immunity. Plaintiff alleges Golubski violated his due process rights under the Fourth and Fourteenth Amendments by (1) fabricating evidence, and (2) withholding material exculpatory and impeachment evidence. First, the Court addresses whether Plaintiff adequately alleges a constitutional injury as to Golubski. If so, the Court then addresses whether the alleged constitutional violation was clearly established or obvious at the time of the incident in question.

To plausibly allege a fabrication claim, Plaintiff must adequately plead facts showing:

> (1) the defendant knowingly or recklessly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty, and (4) if the alleged unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt.[31]

To plausibly allege a withholding claim under *Brady*, a plaintiff must adequately allege facts demonstrating "(1) the government—through a prosecutor, an investigator, a law enforcement officer, or some other 'arm[ ] of the state'—suppressed evidence; (2) the evidence is favorable to the accused; and (3) the evidence is material to the defense."[32]

**a. Golubski**

Plaintiff alleges Golubski knowingly or recklessly fabricated evidence when (1) he first inserted Plaintiff's name into the investigation due to his vendetta against Plaintiff's mother; (2) directed other officers to fabricate evidence to frame Plaintiff for the shooting; (3) directed Block to insert Plaintiff's photo into a photo array; and (4) signed off on officers' reports containing the

---

[31] *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021) (footnotes omitted); *see also Brady v. Maryland*, 373 U.S. 83, 88 (1963).

[32] *Coones v. Bd. of Cnty. Comm'rs of Unified Gov't of Wyandotte Cnty.*, 166 F.4th 1, 17 (10th Cir. 2026) (alteration in original) (quoting *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995)).

evidence he knew was fabricated in order to frame Plaintiff for the shooting. Plaintiff alleges Golubski suppressed material exculpatory evidence when he concealed evidence of (1) his own misconduct; (2) other officers' misconduct; and (3) Brandon's mental health condition. The Court addresses each due process claim in turn.

On the fabrication claim, Golubski argues Plaintiff failed to plausibly allege that (1) he knew that any of the evidence was fabricated, and (2) that he personally participated in the fabrication of evidence. Golubski does not dispute that Plaintiff's allegations meet fabrication elements 2–4, so the Court need only address the first element: whether Plaintiff adequately alleges Golubski knowingly or recklessly fabricated evidence.[33] On this knowledge element, Plaintiff may satisfy his burden by adequately alleging actual knowledge or reckless disregard for the truth.[34]

Plaintiff alleges the following facts support Golubski's knowledge about the fabricated evidence: (1) Golubski inserted Plaintiff's name as a suspect in the shooting investigation without any reason other than his desire to exact retribution against Plaintiff's mother for her rejection of Golubski's sexual advances; (2) Golubski instructed officers to focus their investigation on Plaintiff, despite zero evidence linking the shooting to Plaintiff; (3) Golubski

[33] Golubski may argue that he does dispute any one or combination of elements 2–4 when he stated, "[T]he Complaint makes no allegations that any information provided by Golubski, or one of his alleged informants, was used as the basis to arrest or detain Plaintiff." *See* Doc. 57 at 5 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 281–82 (1993) (Scalia, J., concurring) ("I am aware of, no authority for the proposition that the mere preparation of false evidence, as opposed to its use in a fashion that deprives someone of a fair trial or otherwise harms him, violates the Constitution."))). Golubski never addresses nor cites to authority invoking elements 2–4, so the Court cannot clearly identify whether Golubski intended to dispute these elements. However, such an argument would nonetheless fail, because Golubski stops the logical inquiry one step short. Golubski argues, "it was [Brandon's] identification, not Golubski's alleged suggestion of [Plaintiff] as a potential suspect that allegedly harmed him." *Id.* Indeed, Plaintiff does allege that Brandon's identification was used against him, deprived him of liberty, and would have invalidated his conviction if known. But Plaintiff also alleges that Brandon made the identification directly due to Golubski's initial insertion of Plaintiff's name into the investigation. As such, Golubski's attempt to defeat any combination or totality of elements 2–4 by stopping the chain-of-fabrication one link short is unavailing.

[34] *See Bledsoe v. Carreno*, 53 F.4th 589, 612 (10th Cir. 2022) (citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1285 (10th Cir. 2004)).

signed and approved a report authored by Block that falsely reported that Brandon volunteered information without coercion or suggestion that described a man named "Ced" and his alleged feud with Charles, which was the first indication of Plaintiff's supposed connection to the shooting, despite Golubski's knowledge that he was the first to connect the shooting to Plaintiff and several hours prior to Brandon's statement officers had already advised each other that Plaintiff was a suspect; and (4) Golubski directed Block to insert Plaintiff's photo into an array shown to Brandon.

Golubski replies that even if he first inserted Plaintiff's name into the investigation and obtained his location from an informant, Plaintiff does not allege Golubski participated in the fabrication of evidence or that Golubski reviewed and signed reports knowing the information therein was false or fabricated. Golubski's arguments are unavailing for several reasons. First, as described above, Plaintiff does allege Golubski inserted Plaintiff's name into the investigation and directed his subordinate officers to focus the investigation on Plaintiff as a suspect, despite knowing that there was no evidence implicating Plaintiff in the shooting. Specifically, Plaintiff alleges Golubski only targeted the investigation on Plaintiff because Golubski sought to frame Plaintiff in order to punish Plaintiff's mother for rejecting Golubski's sexual advances.

Second, Plaintiff's allegation that Golubski was the first to supply Plaintiff's name to the investigation due to unrelated, retributory reasons directly supports knowledge of fabrication throughout several stops in the investigation: if Golubski was aware that the information directing the focus of the investigation within 24 hours of the shooting came from his own lie, yet he still reviewed and signed reports detailing contradictory findings on how police first implicated Plaintiff in the investigation, this supports a finding that Golubski was bolstering the

weight of fabricated reports and the evidence they contained with his supervisor signature—the very supervisor who initiated and continued the hunt to frame Plaintiff for the shooting.

Third, and finally, the case law Golubski cites in support of his argument that reviewing and signing police reports detailing fabricated evidence does not amount to personal participation is unpersuasive. For example, Golubski cites for support, *Serna v. Colo Dep't of Corr.*, where the Tenth Circuit found a plaintiff failed to survive summary judgment because the plaintiff did not put forth sufficient evidence that the defendant supervisor directed his subordinate officers to commit constitutional violations, therefore failing to show the defendant's direct participation.[35]

However here, the Court conducts its inquiry at the less demanding 12(b)(6) stage, and Plaintiff alleges far more than Golubski's mere rubber-stamping of fabricated police reports.[36] As explained above, Plaintiff alleges Golubski directed the investigation from its conception to frame Plaintiff, and that Golubski continued to contribute to that fabrication as he reviewed and signed reports detailing evidence he knew to be false. Allowing Golubski to escape a finding of personal participation because he directed other officers to *also* fabricate evidence in support of reinforcing his own fabricated evidence misdirects the inquiry toward the supervisory liability claim. As such, these allegations sufficiently plead that Golubski knowingly or recklessly fabricated evidence.[37]

[35] 455 F.3d 1146, 1153 (10th Cir. 2006).

[36] Golubski also cites case law holding that the denial of a grievance in the prisoner's rights context absent connection to the underlying constitutional violation the plaintiff alleges does not establish personal participation under § 1983. *See* Doc. 57 at 5 (citing *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (finding that a warden who "rubber-stamped" denials of a prisoner's grievances did not personally participate in the alleged violation)). The Court does not disagree with the Tenth Circuit's narrow holding, but it serves no useful application to Plaintiff's allegations that Golubski knew the reports he reviewed and signed contained lies inserted to support *his own* initial fabrication of evidence. Indeed, Plaintiff alleges Golubski's participation in the review and signing of the false reports was part of *Golubski's* fabrication of evidence.

[37] *Bledsoe v. Jefferson County*, 275 F. Supp. 3d 1240, 1254 (D. Kan. 2017) (explaining fabricating evidence is a clearly established constitutional violation).

On the *Brady* claims, Golubski again argues Plaintiff failed to allege that Golubski had actual knowledge or personally participated in suppressing exculpatory evidence, but Golubski misunderstands what level of scienter is required. Civil liability for a *Brady* violation may arise when police officers suppress favorable, material evidence either "knowingly or with reckless disregard for the truth."[38]

And Plaintiff does allege Golubski knowingly, or with reckless disregard for the truth, suppressed material exculpatory evidence. For example, Plaintiff alleges the prosecutor at trial emphasized to the jury that their verdict overwhelmingly rested on their belief in Brandon's testimony, thus evidence that it was Golubski who first tied Plaintiff's name to the shooting and not Brandon is necessarily material because it directly contradicts Brandon's testimony and the report that Golubski reviewed and signed. Certainly, Plaintiff explicitly alleges that Golubski (1) was the first to input Plaintiff's name into the investigation; (2) directed subordinate officers to focus their investigation on Plaintiff without any evidence supporting this directive; (3) subsequently reviewed and signed reports detailing fabricated evidence that told an entirely different, false story about Plaintiff's introduction to the investigation; and (4) did so as a means of exacting revenge against Plaintiff's mother for her rejection of Golubski's sexual advances.

Golubski attempts to obfuscate what is required at this stage by arguing that: "one cannot reasonably infer from the fact that a police Captain who reviewed a detective's report had knowledge of the falsity of the information it contained or knowledge of the tactics used to obtain an eyewitness identification."[39] Golubski's argument misunderstands what Plaintiff alleges. Plaintiff does not infer Golubski's knowledge of the report's falsity from his mere

[38] *Coones*, 166 F.4th at 17 (quoting *Pierce*, 359 F.3d at 1298).

[39] Doc. 57 at 5.

review of the report. Instead, Plaintiff plausibly alleges that Golubski's role as the instigating force behind framing Plaintiff for the shooting and his subsequent review and signing of reports detailing the very lies supporting Golubski's framing of Plaintiff are themselves acts of suppressing exculpatory evidence. Undeniably, Golubski reviewed and signed officers' reports, initialing each page as he did so, that claimed Brandon first identified Plaintiff, despite Golubski knowing that the truth of his actions did not align with what his officers reported. In short, by signing the reports that Golubski knew contained lies concealing *his* misconduct, Golubski was also suppressing the exculpatory evidence of his subordinate officers' misconduct.

Additionally, Plaintiff alleges Golubski knowingly or recklessly suppressed evidence of his own misconduct, including his fabrication of evidence. Because the Court has already found Plaintiff's fabrication allegations are sufficient, so is Plaintiff's allegation that Golubski violated his *Brady* rights by suppressing evidence of that fabrication.[40] Plaintiff also alleges Golubski suppressed exculpatory evidence of Brandon's mental health and delusions. However, Plaintiff's Amended Complaint fails to sufficiently tailor his allegations about Brandon's mental health and delusions to Golubski.

Yet, the Court does find that Plaintiff adequately alleges that Golubski suppressed exculpatory evidence that Brandon's statements were rife with lies and contradictions, because it was Golubski who input Plaintiff into the investigation and directed his officers to tailor their investigation to supporting Golubski's goal in framing Plaintiff. As such, the Court finds that a

[40] *Scott v. City of Tulsa*, 775 F. Supp. 3d 1190, 1208 (N.D. Okla. 2025) (finding allegations sufficiently plead a *Brady* violation where the defendants withheld evidence of their witness coercion). Plaintiff asserts this *Brady* theory against Golubski, but Golubski does not explicitly address this theory in his opening brief. Such an argument would nonetheless fail because the predicate fabrication claim survives this procedural stage. However, to the extent Golubski does address this theory for the first time in his reply brief, this argument is waived. *See, e.g.*, *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) ("[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief." quoting *M.D. Mark, Inc. v. Kerr–McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009)).

reasonable inference can be made from the evidence that Golubski knew his officers at least persuaded, but more likely pressured, Brandon into providing false statements to bolster Golubski's original lie. Accordingly, at this procedural stage, Plaintiff's *Brady* claim sufficiently alleges Golubski violated Plaintiff's constitutional rights.

**b. Clearly Established**

Finally, because the Court has found Plaintiff adequately alleges constitutional violations based on fabrication and withholding against Golubski, the Court must now inquire whether the alleged constitutional violations were clearly established or obvious at the time of the incident in question. A constitutional right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate."[41] But a court shouldn't "define clearly established law at a high level of generality."[42]

"Ordinarily, to make such a showing of clearly established law in our circuit, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[43] But "a government official may still have notice that their conduct violates a constitutional right [when] it is so apparent as to apply with obvious clarity."[44] "In this regard, the Supreme Court has reminded us recently that under certain 'extreme circumstances' general

---

[41] *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation modified).

[42] *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

[43] *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (citation modified).

[44] *Brown v. City of Tulsa*, 124 F.4th 1251, 1265 (10th Cir. 2025).

constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful."[45]

Golubski argues that the law in 2009 did not clearly establish that "simply providing the name of a potential suspect to investigate" and "simply reviewing and signing subordinates' reports, absent knowledge that their contents were falsified or suppressed evidence, would meet the personal participation requirements for liability."[46] However, Golubski's argument erroneously narrows the inquiry to fit his reading of Plaintiff's allegations. Rather, as explained above, Plaintiff successfully alleges that Golubski violated his constitutional rights when he (1) knowingly or with reckless disregard for the truth fabricated evidence; and (2) withheld material exculpatory evidence. Guided by what Plaintiff actually and successfully alleges, the Court finds both violations were clearly established or obvious prior to 2009.[47] As such, Golubski is not entitled to qualified immunity on Count I, and his motion to dismiss Count I is denied.

**2. Malicious Prosecution Claim (Count II)**

Plaintiff alleges Golubski caused his prosecution without probable cause when he fabricated evidence and withheld exculpatory evidence as a means of punishing Plaintiff for his mother's rejection of Golubski's sexual advances. Golubski argues Plaintiff fails to adequately allege a constitutional violation, entitling him to qualified immunity. The Tenth Circuit analogizes § 1983 malicious prosecution claims to the common law tort of malicious prosecution

---

[45] *Frasier*, 992 F.3d at 1015 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (per curiam)); *see also Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) ("The degree of specificity required from prior case law depends in part on the character of the challenged conduct. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").

[46] Doc. 57 at 6–7.

[47] *Bledsoe v. Carreno*, 53 F.4th 589, 609–11 (10th Cir. 2022) (holding that the fabrication of evidence was clearly established well before 1999); *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) (holding that the "prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986").

for the purpose of determining the elements of the claim: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages."[48] Golubski contends Plaintiff fails to adequately allege the probable cause and causation elements and doesn't challenge the other elements. Golubski also argues that Plaintiff failed to allege his personal participation in the acts related to fabrication and suppressing evidence, but Golubski's argument on this front is unavailing for the reasons already explained above.

**a. Probable Cause**

Golubski contends arguable probable cause existed to pursue Plaintiff's arrest and prosecution. The Tenth Circuit has explained that "[p]robable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."[49] When assessing probable cause, "the relevant question is whether a substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion."[50] "Officers must consider the totality of the evidence known to them when considering probable cause, and in cases where they have both inculpatory and exculpatory evidence they must not ignore the exculpatory evidence in order to find probable cause."[51]

---

[48] *McCarty v. Gilchrist*, 646 F.3d 1281, 1285 (10th Cir. 2011).

[49] *United States v. Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022) (citation modified).

[50] *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 879 (10th Cir. 2014) (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)).

[51] *Id.* (quoting *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 637 (6th Cir. 2004) (citation modified)).

"[O]rdinarily, the statement of a victim of a crime to police may establish probable cause absent some reason to think the statement not trustworthy."[52] "If the police have 'reason to think the statement [is] not trustworthy,' however, then the police cannot rely on an uncorroborated victim statement to establish probable cause."[53] In the context of fabricated or withheld evidence, like Plaintiff alleges here, the inquiry is "whether, 'without the falsified inculpatory evidence, or with the withheld exculpatory evidence, there would be no probable cause for [Plaintiff's] continued confinement or prosecution."[54]

Golubski contends arguable probable cause existed to pursue Plaintiff's arrest and prosecution because: (1) police recovered a firearm hidden in an air vent at 2025 Lawn Avenue, where Plaintiff and Moore were also found; (2) the grip of that firearm contained two partial DNA profiles which were consistent with Moore's DNA and would be present in 1 in every 43 African Americans; and (3) there are no allegations Golubski knew Brandon's identification was allegedly falsely coerced and Golubski was entitled to rely on the reports of his subordinates indicating Brandon had made a positive identification. The Court finds Golubski's arguments unpersuasive for several reasons.

First, Plaintiff alleges all of the evidence initially implicating him in the investigation was clearly untrustworthy as it stemmed from Golubski and that Golubski also directed his officers to focus their investigation on Plaintiff based solely on his pursuit of revenge. As such, in order to find probable cause, Golubski essentially asks the Court to simultaneously find that (1) he knew Plaintiff's initial appearance in the investigation was not based on any actual evidence, but rather

---

[52] *Cortez v. McCauley*, 478 F.3d 1108, 1121 (10th Cir. 2007).

[53] *Coones v. Bd. of Cnty. Comm'rs of Unified Gov't of Wyandotte Cnty.*, 166 F.4th 1, 29 (10th Cir. 2026) (quoting Cortez, 478 F.3d at 1121).

[54] *Bledsoe v. Carreno*, 53 F.4th 589, 614–15 (10th Cir. 2022) (quoting *Pierce*, 359 F.3d at 1295).

his personal vendetta, and (2) that he had no reason to question the veracity of Brandon's identification of the same man he coincidentally sought to frame for the shooting.[55] Golubski's argument asks the Court to take an absurd position and ignore half of what Plaintiff actually alleges.[56] The Court declines both offers.[57]

Second, Golubski misrepresents what Plaintiff alleges regarding the gun found at 2025 Lawn Avenue. Plaintiff alleges that the only reason police identified the house where Plaintiff, Moore, and the gun were found was due to Golubski's instigating mission to frame Plaintiff for the shooting. Golubski cannot aim his officers in the direction of Plaintiff as a means of framing Plaintiff, and then claim probable cause at the house where Plaintiff was staying based on a discovered-gun containing DNA that was not a unique match to Plaintiff nor Moore. Importantly, Golubski does not address Plaintiff's allegation that the expert that analyzed the found DNA described it as a "pretty common [DNA] profile." Considering the totality of the evidence known to Golubski, he had no reason to find probable cause existed. Indeed, without the falsified inculpatory evidence, or with the withheld exculpatory evidence, there was no probable cause to arrest and prosecute Plaintiff.

Third, and finally, Golubski fails to adequately address whether he could ever reasonably trust any evidence allegedly linking Plaintiff to the shooting. From the investigation's genesis, Golubski, without evidentiary basis, tied Plaintiff to the shooting and ordered his officers to

---

[55] Golubski argues that an officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable. Doc. 57 (citing *Halley v. Huckaby*, 902 F.3d 1136, 1150 (10th Cir. 2018)). The Court doesn't disagree with Golubski's citation of the law but simply explains in detail above that Plaintiff alleges far more than Golubski's reliance on flawed conclusions.

[56] *Cortez v. McCauley*, 478 F.3d 1108, 1121 (10th Cir. 2007) ("[O]rdinarily, the statement of a victim of a crime to police may establish probable cause absent some reason to think the statement not trustworthy.").

[57] *Wilkins v. DeReyes*, 528 F.3d 790, 801 (10th Cir. 2008), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022) (finding an absence of probable cause for a malicious prosecution claim where the officers relied entirely on allegedly coerced false statements).

focus their investigation on Plaintiff. At a minimum, Golubski had reason to question the veracity of every piece of evidence tying the shooting to Plaintiff. Golubski cannot hide behind the actions of his subordinate officers who began investigating Plaintiff when the only reason they did so stemmed from Golubski's malicious directive untethered from evidentiary basis.[58] Certainly, if all you have is a hammer, everything looks like a nail.

**b. Causation**

Golubski argues that Plaintiff cannot adequately allege causation because Block and Koberlein obtained Brandon's identification of Plaintiff and drafted reports that allegedly suppressed information and led to the prosecution participation, therefore breaking the chain of causation to any prior role played by Golubski. However, as discussed earlier, Golubski cannot hide behind the fact that he neither interviewed Brandon nor drafted the investigative reports that suppressed exculpatory evidence and contributed to Plaintiff's prosecution.[59] On this point, the Court agrees with Judge Posner's observation in *Jones v. City of Chicago*: "If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded."[60]

Here, Plaintiff plausibly alleges Golubski directed his officers to focus their investigation on Plaintiff in order to frame Plaintiff for the shooting. It is irrelevant for the purposes of causation that other government officials who conducted Plaintiff's investigation also

---

[58] *Mink v. Knox*, 613 F.3d 995, 1003 (10th Cir. 2010) ("The substance of Probable Cause is a 'reasonable ground for belief of guilt'" (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)) (The substance of probable cause is a "reasonable ground for belief of guilt."))).

[59] *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004) ("The actions of a police forensic analyst who prevaricates and distorts evidence to convince the prosecuting authorities to press charges is no less reprehensible than an officer who, through false statements, prevails upon a magistrate to issue a warrant.").

[60] 856 F.2d 985 (7th Cir. 1988).

maliciously abused their positions of trust to corroborate Golubski's founding lie and "to induce the criminal justice system to confine and then to prosecute an innocent defendant."[61] The Court views all types of this conduct "as equally repugnant to the Constitution."[62]

**c. Clearly Established**

Plaintiff has also demonstrated the second prong of the qualified immunity analysis on the malicious prosecution claim—that it was clearly established at the time of the investigation. Well before the February 14, 2009 shooting investigation was underway, the Tenth Circuit "held in *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004), that '[n]o one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest.'"[63] In sum, Golubski is not entitled to qualified immunity on Count II, and his motion to dismiss this claim is denied.

**3. Failure to Intervene Claim (Count III)**

Plaintiff asserts Count III against Golubski by alleging that Golubski witnessed but failed to prevent clearly unlawful conduct by other defendants, including flagrant fabrication of evidence. Additionally, Plaintiff alleges even further that Golubski's failure to intervene was an affirmative act taken to advance his personal agenda when he signed off on and approved of the officers' unconstitutional misconduct by instructing them to target specific suspects. In response, Golubski argues Plaintiff failed to adequately allege that he observed or had reason to know about the alleged violations and failed to stop them, entitling him to qualified immunity. The Tenth Circuit has recognized a claim for failure to intervene under § 1983 because "all law

---

[61] *Pierce*, 359 F.3d at 1293.

[62] *Id.*

[63] *Sanchez v. Hartley*, 810 F.3d 750, 759 (10th Cir. 2016) (quoting *Pierce*, 359 F.3d at 1292).

enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."[64] To show a constitutional violation, Plaintiff must demonstrate the following elements: "1) a government officer violated [Plaintiff's] constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so."[65]

**a. Constitutional Violation**

First, as detailed in the Court's Order on Defendants' Motion to Dismiss[66], Plaintiff adequately alleges Block, Koberlein, and Dundovich all individually violated his constitutional rights, including through fabricating evidence, suppressing exculpatory evidence, and maliciously prosecuting him without probable cause.[67] Second, Plaintiff alleges Golubski knew of, and affirmatively approved of, those Defendants' ongoing constitutional deprivations. In response, Golubski argues Plaintiff fails to allege that he: (1) was present for Brandon's interview or aware of any information that needed to be disclosed; or (2) had reason to know about the alleged violations based simply on him providing Plaintiff's name to detectives. The Court disagrees for several reasons.

Golubski denies liability based on his construction of when the constitutional violations occurred. But the Court does not read Plaintiff's Amended Complaint to cabin his allegations of constitutional violations to such temporally succinct instances. Rather, Plaintiff alleges officers violated his constitutional rights throughout Plaintiff's investigation and prosecution, and that

[64] *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022) (quoting *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008)).

[65] *Id.*

[66] Doc. 55 at 34.

[67] Golubski does not dispute that Plaintiff adequately alleges this element.

Golubski knew that he had months of opportunity to intervene during the investigation he designed to frame Plaintiff.

For example, even if Golubski was not present for any of Brandon's interviews, Golubski had every reason to question (1) the coincidence of an uncorroborated witness identifying the same man Golubski intended to frame, and (2) the false report of an officer stating Brandon was the first to identify Plaintiff despite Golubski identifying Plaintiff to officers hours earlier. In response, Golubski offers that "[he] would not have reason to know about the alleged violations based simply on him providing [Plaintiff's] name to detectives."[68] To share Golubski's conclusion would require the Court to ignore the basic premise of Plaintiff's Amended Complaint: Golubski's goal was to frame Plaintiff for the murders of Charles and LeDoux.

Golubski further argues that even if he had a retaliatory intent in supplying Plaintiff's name in the first instance, that would not negate the subsequent witness identification or DNA testing linking one of the involved firearms to Plaintiff's location and DNA profile. The Court need not reexamine why Golubski's characterization of the gun and related DNA is antithetical to what Plaintiff alleges, because Golubski's argument is irrelevant to the failure-to-intervene inquiry. Whether the officers Golubski sent to investigate Plaintiff as means of framing Plaintiff found the gun and accompanying DNA is irrelevant when considering Golubski's knowledge of, and ability to intervene in, the constitutional violations that occurred prior to, during, and after that discovery.

Finally, Golubski argues that Plaintiff failed to allege that he had adequate opportunity to intervene. Golubski's argument on this front is again largely tied to his erroneous temporal framing of Plaintiff's allegations. To be sure, the Court finds the Tenth Circuit's decision in

---

[68] Doc. 57 at 10.

*Bledsoe v. Carreno*[69] instructive. There, the Tenth Circuit found a plaintiff adequately alleged defendants had reasonable opportunity to intervene where the defendants fabricated evidence, suppressed exculpatory evidence, and maliciously prosecuted the plaintiff as part of a conspiracy to frame the plaintiff over a period of months.[70]

In short, the Court finds that Plaintiff adequately alleged that Golubski knowingly failed to intervene in other officers' constitutional violations in that (1) Golubski was the supervisor throughout the investigation who reviewed every report, initialing each page; (2) Golubski was the first individual to insert Plaintiff's name into the investigation, and did so as a means of exacting retribution; (3) Golubski instructed officers to target Plaintiff, including telling them to insert Plaintiff's picture into a photo array; and (4) Golubski knew that he approved reports that contained statements he knew to be untrue, including Dundovich's lie masking how police located Plaintiff at 2025 Lawn Avenue.

**b. Clearly Established**

The question, then, is whether Plaintiff's right to have Golubski intervene at any point during the investigation and prosecution was clearly established at the time of the investigation. The Court agrees with Golubski that the law was not clearly established in 2009. In 2022, the Tenth Circuit reversed a district court's decision denying qualified immunity on a failure-to-intervene claim in the context of allegations that law enforcement officers fabricated inculpatory evidence, withheld exculpatory evidence, and maliciously prosecuted the plaintiff.[71] The court explained that in 1999, when the investigation at issue occurred, the court had not recognized a

[69] 53 F.4th 589, 616 (10th Cir. 2022).

[70] *Id.*

[71] *Id.* at 617.

failure-to-intervene claim at all.[72] And, prior to 2022, the Tenth Circuit had only recognized in published decisions that this claim applied in the excessive force context.[73] For the first time in *Bledsoe*, the Tenth Circuit made clear that a failure-to-intervene claim can apply to other constitutional violations:

> We hold that a failure-to-intervene claim is not limited to excessive force violations, but can involve other underlying constitutional violations. Specifically, here, Bledsoe adequately alleged a violation of his constitutional rights premised on Defendants' failure to intervene in the alleged fabrication of evidence against Bledsoe, the suppression of exculpatory evidence that would have proven his innocence, and the malicious arrest, prosecution, and conviction of Bledsoe without probable cause to believe he was guilty.[74]

Plaintiff has therefore not met his burden of showing that it was clearly established in 2009 that Golubski had a duty to intervene outside of the excessive force context.[75]

Nonetheless, Plaintiff raises another argument that was not addressed in *Bledsoe*: that it would have been obvious to any objectively reasonable officer that they had a duty to intervene and stop the constitutional violations in this case under *Hope v. Pelzer*.[76] As the Court has explained, even if there is no Supreme Court or Tenth Circuit decision on point, a plaintiff can meet this prong under *Hope* by showing it is obvious. Under *Hope*, a right may be clearly established if it would have been obvious to a reasonable officer, despite the lack of on-point

---

[72] *Id.*

[73] *Id.* at 616–17 (collecting cases); *see Vondrak*, 535 F.3d at 1210.

[74] *Id.* at 617.

[75] *See id.*; *see also Shaw v. Schulte*, 36 F.4th 1006, 1020–21 (10th Cir. 2022) ("[W]here the intrusion and permanency of harm from the use of excessive force may exceed that from the relatively brief prolongation of a traffic stop, *Vondrak* does not clearly establish that an officer must intervene to prevent an illegal search and seizure. Accordingly, Mr. Bosire has not overcome the second prong of Trooper Schulte's qualified-immunity defense.").

[76] 536 U.S. 730, 741 (2002). In *Bledsoe*, the plaintiff did not make that argument, so the court did not address it. 53 F.4th at 617.

authority recognizing a failure-to-intervene claim outside of the excessive force context.[77] To be sure, "*Hope*'s holding historically has been applied to only the 'rare "obvious case,"' involving 'extreme circumstances,' or 'particularly egregious' misconduct."[78] On this point, Plaintiff argues *Atchison v. City of Tulsa* is persuasive, and the Court agrees.[79] Golubski does not address this argument.

In *Atchison*, the court addressed at summary judgment whether a detective's duty to intervene "would have 'been obvious to any objectively reasonable law enforcement officer'" where the detective could have intervened when another detective provided a witness with false information and then coerced a false statement by threatening him with the death penalty during an interview.[80] The court denied qualified immunity and found that this duty would have been obvious in 1991, particularly in light of the defendant detective's testimony that police officers are often required to take an oath to uphold the law, which includes being honest.[81]

While the issue here is presented at the earlier, less demanding Rule 12(b)(6) stage, the Court agrees with the *Atchison* court's analysis. For the state of the law during Golubski's investigation gave him fair warning that his alleged conduct in instigating and directing this investigation was obviously unconstitutional. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held

---

[77] *Hope*, 536 U.S. at 741.

[78] *Frasier*, 992 F.3d at 1021 (first quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018); and then quoting *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020)).

[79] *Atchison v. City of Tulsa*, No. 21-CV-286-JDR-SH, 2025 WL 2444597, at *11 (N.D. Okla. Aug. 25, 2025) (addressing *Bledsoe*).

[80] *Id.* (quoting *Bledsoe*, 53 F.4th at 617).

[81] *Id.*

unlawful but it is to say that in the light of pre-existing law, the unlawfulness must be apparent."[82]

Indeed, this type of scenario was what the Supreme Court had in mind in *Hope* when it discussed conduct so clearly and obviously wrong that the conduct itself unmistakably "should have provided [Golubski] with some notice" that his alleged conduct violated Plaintiff's constitutional rights.[83] Plaintiff sufficiently alleges that Golubski initiated and oversaw an investigation targeting Plaintiff as its main suspect of a double homicide and shooting for the purpose of exacting revenge against the son of a mother who rejected denied Golubski's unwanted sexual advances.

The fact that this exact fact pattern may not have been addressed by the Supreme Court or Tenth Circuit does not mean Golubski should be immune. "The easiest cases don't even arise. There has never been. . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability."[84] "Try as we might, [the Court] cannot conceive of circumstances in which [the officer] would not know and understand that [he] could not" fabricate evidence, bury exculpatory evidence, affix the legitimacy of his review and approval to reports he knew to contain lies, and then hide behind the unconstitutional acts (almost entirely taken at his directive) of his inferior officers in order to frame an innocent man for the sin of having a mother reject his desire to coerce power for sex.[85] As such, Golubski is not entitled to qualified immunity on this claim.

---

[82] *Hope*, 536 U.S. at 739 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (citation omitted).

[83] *Id.* at 745.

[84] *United States v. Lanier*, 520 U.S. 259, 271 (1997) (alterations in original) (quoting 73 F.3d 1380, 1410 (6th Cir. 1996) (Daughtrey, J., dissenting)).

[85] *Hardwick v. County of Orange*, 844 F.3d 1112, 1120 (9th Cir. 2017).

**4. Conspiracy Claim (Count IV)**

Golubski argues Plaintiff failed to adequately allege his conspiracy claim, entitling him to qualified immunity. To prevail on a conspiracy claim under § 1983, Plaintiff "must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient."[86] The Court has already found above, and in its previous Order on Defendants' Motion to Dismiss[87], that Plaintiff sufficiently plead deprivation of his constitutional rights on the due process, malicious prosecution, and failure to intervene claims, so now the Court must determine if he sufficiently demonstrated a conspiracy.

For the conspiracy, there must be "at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective."[88] "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim."[89] Rather, the Tenth Circuit demands specificity to plead conspiracy. "A § 1983 plaintiff must 'make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.'"[90]

At this procedural juncture, the Court concludes that Plaintiff has alleged a cognizable conspiracy theory. Plaintiff has alleged sufficient facts to support his conspiracy claim against

[86] *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990) (quoting *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990)).

[87] Doc. 55 at 38.

[88] *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) (quoting *Brooks v. Gaenzle*, 614 F.3d 1213, 1227–28 (10th Cir. 2010)).

[89] *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998).

[90] *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008)); *see also Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989) (affirming dismissal of conspiracy claim where "plaintiff failed to allege specific facts showing agreement and concerted action among defendants").

Golubski. "[D]rawing the line between a conclusory and non-conclusory conspiracy allegation isn't always a precise task."[91] "Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain other actions of the alleged conspirators taken to achieve that purpose will be deemed sufficient."[92]

As previously explained, Plaintiff sufficiently alleges Golubski, Block, Koberlein, Dundovich, and Slater intentionally fabricated inculpatory evidence, suppressed exculpatory evidence, and suppressed official misconduct in order to further their joint purpose and motivation during the immediate 24 hours after the shooting: to wrongfully prosecute Plaintiff. For example, Plaintiff alleges Golubski, Block and Koberlein worked in concert to pressure and coerce Brandon into affirming Golubski's fabricated information that Block and Koberlein then fed Brandon with the goal of falsely implicating Plaintiff. Specifically, Plaintiff alleges Golubski reviewed and approved Block's false report detailing that in an interview, at around 2:00 p.m., Brandon gave Block and Koberlein the first documented reference to Plaintiff, despite Golubski telling Block and Koberlein to investigate Plaintiff several hours earlier, at around 11:30 a.m. As such, Plaintiff alleges Golubski went beyond mere "unlawful parallel activity," and instead advanced the conspiracy from its inception to its ultimate success.[93]

Likewise, Plaintiff sufficiently alleges that within 12 hours of the shooting, Golubski baselessly injected names and descriptions of the alleged shooters into the investigation and then Block, Koberlein, and Dundovich met with each other thereafter to conceal Golubski's action. For example, after Block and Koberlein advised Dundovich to locate Plaintiff and an unnamed man, Dundovich fabricated evidence of how he found Plaintiff to cover up the fact that the

[91] *Zorn v. City of Marion*, 774 F. Supp. 3d 1279, 1330 (D. Kan. 2025).

[92] *Cash v. Wetzel*, 8 F. Supp. 3d 644, 661 (E.D. Pa. 2014) (citation modified).

[93] *Zorn*, 774 F. Supp. 3d at 1330–31.

information of Plaintiff's whereabouts actually originated from Golubski. This all occurred within 24 hours of the shooting and after various meetings among Golubski and his co-defendants prior to the deprivation of Plaintiff's constitutional rights.

The Court acknowledges that the line dividing plausible conspiracy allegations from implausible is not a bright one. But the Amended Complaint adequately alleges the conspiracy's members, the conspiracy's timeframe, the purpose and motivation of the conspiracy, and the overt acts taken to achieve its aim. Taken collectively, those allegations suffice. They raise a plausible inference of a conspiracy.[94] Moreover, Golubski's co-conspirators need not "possess [his] same motives for desiring the intended conspiratorial result," for Plaintiff to adequately allege his conspiracy claim.[95] Thus, the Court finds the allegations against Golubski are sufficient at this procedural stage.[96]

Finally, Plaintiff has also demonstrated the second prong of the qualified immunity analysis on his conspiracy claim—that it was clearly established at the time of the 2009 shooting investigation. As the Tenth Circuit has explained, "a § 1983 conspiracy claim for using fabricated or false evidence was clearly established well before 1999."[97] As such, Golubski is not entitled to qualified immunity on this claim.

---

[94] *Meyer v. City of Marion*, 776 F. Supp. 3d 991, 1022 (D. Kan. 2025) (citing *Cash*, 8 F. Supp. 3d at 661).

[95] *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990).

[96] *See, e.g.*, *Bledsoe*, 53 F.4th at 609–10 (affirming denial of motion to dismiss where plaintiff alleged "specific goal of the conspiracy" and "identified specific actions" each individual defendant took to consummate conspiracy); *Montoya v. City & Cnty. of Denv.*, No. 21-1107, 2022 WL 1837828, at *8 (10th Cir. 2022) (affirming denial of motion to dismiss where allegations of conspiracy weren't "impressively detailed" and included some "boilerplate language" but still advanced sufficient allegations to infer an implicit agreement); *Erickson v. City of Lakewood*, 489 F. Supp. 3d 1192, 1204 (D. Colo. 2020) (declining to dismiss conspiracy claim where complaint alleged that defendants made a plan, assigned roles to co-conspirators, and carried out roles).

[97] *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (citing *Anthony v. Baker*, 767 F.2d 657, 662 (10th Cir. 1985)).

**5. Supervisory Liability Claim (Count V)**

Plaintiff alleges a supervisory liability claim against Golubski in Count V. While Golubski references Plaintiff's supervisory liability claim in his motion to dismiss and supervisory liability in general throughout his briefing, Golubski never provides any specific arguments in support of dismissal. Importantly, Golubski's opening paragraph to his motion to dismiss expressly moves "for dismissal of Counts 1-4, and 7-9," but he never invokes Count V.[98] Thus, Plaintiff argues that Golubski's omission waives any ability to address Count V in the future;[99] and Golubski never responds to this argument in his reply brief. In sum, the Court discerns no indication that Golubski moves to dismiss Count V; and therefore the Court refrains from addressing Plaintiff's supervisory liability claim at this stage.[100]

**B. State Law Claims**

Plaintiff alleges three state law claims against Golubski: (1) malicious prosecution under Kansas law (Count VII); (2) intentional or reckless infliction of emotional distress under Kansas law (Count VIII); and (3) negligent infliction of emotional distress under Kansas law (Count IX). Golubski moves to dismiss Count VII as time barred under K.S.A. §§ 59-2239(2), 60-514(b), and Counts VIII–IX as time barred under the relevant statute of limitations and statute of repose. Golubski also moves to dismiss Count IX for failure to allege a physical injury. The Court first addresses Count VII and then addresses Counts VIII–IX.

---

[98] *See* Doc. 57 at 1.

[99] Doc. 68 at 2 n.2 ("Other than very brief mentions on pages 2 and 4 of his Motion to Dismiss, Golubski does not address [Plaintiff's] supervisory liability claim. . . As this Court has held, any argument to dismiss this claim is thus waived, even if Golubski attempts to address it in his reply brief.").

[100] *Roberts v. U.S. Dep't of Veterans Affs.*, No. 20-CV-01358-JAR-KGG, 2021 WL 1426767, at *4 (D. Kan. 2021) ("It is fundamental that federal courts do not render advisory opinions and that they are limited to deciding issues in actual cases and controversies."); *see, e.g., Fashion House, Inc. v. KMart Corp.*, 892 F.2d 1076, 1095 (1st Cir. 1989) (emphasizing that federal courts should avoid rendering advisory opinions that "deal with a covey of birds which may never come home to roost").

### 1. Malicious Prosecution Under Kansas Law (Count VII)

Under Kansas law, malicious prosecution claims are subject to the one-year statute of limitations established under K.S.A. § 60-514(b). Plaintiff and Golubski agree that the limitations period for Plaintiff's malicious prosecution claim under Kansas law ran on December 11, 2025. On October 30, 2025, Plaintiff filed his Original Complaint and named Golubski's son, Matthew Golubski, as the defendant representative of Golubski's estate. On December 8, 2025, Matthew moved to dismiss for lack of capacity to be sued, arguing that while he "filed a Petition for Determination of Descent, he did not petition the court for administration of his father's estate, and he did not request to have an administrator or personal representative appointed."[101]

On March 6, 2026, Plaintiff filed his opposition[102] to Matthew's motion to dismiss, asking the Court deny the motion as moot in light of Plaintiff's contemporaneously filed motion for leave to amend complaint.[103] In his motion for leave to amend, Plaintiff stated the following:

> Defendant Matthew Golubski filed a Motion to Dismiss for Lack of Capacity to be Sued ("Motion to Dismiss") on December 8, 2025. (Doc. 21). In his Motion to Dismiss, Matthew Golubski argues that he is not the proper party to be sued on behalf of Roger Golubski's estate. He acknowledges that he filed a Petition for Determination of Descent with the Probate Division of the Wyandotte County District Court on June 2, 2025. (Doc. 21, p. 2 ¶ 4, Ex. 1). He acknowledges that Wyandotte County District Court issued a Decree of Descent naming him as Roger Golubski's sole heir under Kansas's laws of interstate [sic] succession and finding him entitled to 100% of Roger Golbuski's estate. (*Id.* ¶ 5, Ex. 2). However, he argues that such determination does not deem him the personal representative of Roger Golubski's estate.
>
> Plaintiff's counsel is not aware of any Kansas authority indicating that an heir that the court has decreed to be the sole descendant

[101] Doc. 21 at 5.

[102] Doc. 48.

[103] Doc. 47.

> entitled to 100% of an estate may not be sued on behalf of the estate. However, Matthew Golubski points to authority in his Motion to Dismiss that permits an administrator to be specially appointed to represent the estate in claims filed against the estate. (Doc. 21, p. 4 (citing K.S.A. § 59-2239; K.S.A. § 59-710)).
>
> Following notice of agreement between the parties and after receiving the Oath of the Special Administrator, on January 29, 2026, Wyandotte County District Court appointed attorney Daphne Halderman as the Special Administrator of Roger Golubski's estate and issued Letters of Special Administration. *Id.* A true and correct copy of the Order Appointing Special Administrator along with accompanying Letters of Special Administration is attached hereto as Exhibit C.[104]

Additionally, Plaintiff stated that Special Administrator Daphne Halderman consented to the substitution. On March 6, 2026, Magistrate Judge Rachel Schwartz entered an Order for expedited briefing on Plaintiff's motion for leave to amend, but no party ever filed a response or opposition. Consequently, on March 13, 2026, Magistrate Judge Schwartz granted Plaintiff leave to file his First Amended Complaint, and Plaintiff did so that same day, with the only amendment consisting of substituting Matthew for Halderman.

Under Kansas law, K.S.A. § 59-2239 governs tort claims against the administrator of a decedent's estate. Halderman argues that the special limitations periods under K.S.A. § 59-2239, referred to as a nonclaim statute, govern, because Golubski died prior to Plaintiff filing his Amended Complaint against the appropriate representative of Golubski's estate. K.S.A. § 59-2239(1) provides two time-limits:

> (1) a statute of limitations providing that "[a]ll demands" against a decedent's estate must be brought within four months after publication of notice to creditors of the initiation of probate proceedings (or 30 days after actual notice to a known or reasonably ascertainable creditor); and (2) a statute of repose providing that all unsecured claims against a decedent's estate must

[104] *Id.* ¶¶ 2–3, 6.

> be initiated (by petitioning for probate of the will or administration of the estate) within six months of the decedent's death.

However, K.S.A. § 59-2239(2) provides an exception to the limits imposed by subsection (1):

> claimants seeking to bring tort claims against a decedent's estate may bring such claims despite the subsection (1) time bar so long as they are otherwise timely under the general statutes of limitations, and so long as any recovery by the claimant shall not affect the distribution of the assets of the estate of the decedent unless a claim was filed in the district court within the time allowed for filing claims against the estate under subsection (1).

As such, Golubski argues a plain reading of § 59-2239(2) requires: (1) the estate be opened; (2) an administrator appointed; and (3) suit filed, all within the one-year limitations period. And that Plaintiff failed these requirements because (1) Golubski's Estate was opened on January 7, 2026; (2) Halderman was appointed as Special Administrator of Golubski's Estate on January 29, 2026; and (3) suit was filed against Halderman on March 13, 2026, when Plaintiff filed his Amended Complaint. Thus, according to Golubski, none of the prerequisites to bringing a tort claim against Golubski's Estate occurred "within the period of the statute of limitations," and the claim is time-barred by § 59-2239(2) and § 60-514(b).

Plaintiff responds that subsection (2)'s limitations language "modifies only the third requirement that suit be filed against the administrator" and that "subsection (2) does not by its terms prohibit the use of relation back."[105] Therefore, Plaintiff argues that under the relation back doctrine as established by Fed. R. Civ. P. 15(c)(1)(C), an amendment substituting a new defendant relates back to the original complaint when: (1) it arises from the same conduct as the original complaint; (2) the new defendant received notice within the Fed. R. Civ. P. 4(m) period

[105] Doc. 68 (citing *Fed. Deposit Ins. Corp. v. Lindamood*, No. 14-2396-JWL, 2015 WL 4642433, at *2 (D. Kan. Aug. 4, 2015)).

such that it suffers no prejudice; and (3) the new defendant "knew or should have known the action would have been brought against it but for a mistake concerning the proper party's identity."[106]

The parties do not dispute the procedural timeline of when: (1) Golubski died; (2) Plaintiff filed his Original Complaint; (3) Halderman was appointed; nor (4) when Plaintiff filed his Amended Complaint. Nor do the parties dispute that malicious prosecution claims are subject to the one-year statute of limitations established under K.S.A. § 60-514(b). Thus, the Court turns its inquiry to whether K.S.A. § 59-2239 bars relation back under Rule 15(c)(1)(C). If not, the Court finally asks whether Plaintiff met his burden under Rule 15(c)(1)(C).

In answering the first part of the inquiry, the Court finds *Fed. Deposit Ins. Corp. v. Lindamood* on point.[107] There, Judge Lungstrum found K.S.A. § 59-2239(2) did not bar relation back under Rule 15(c) for two reasons. "First, because amendment of a complaint involves a matter of procedure, the Court applies federal law; thus, the terms of [F]ederal Rule 15(c) would take precedence here even if subsection 59–2239(2) prohibited the use of relation back for satisfaction of its requirement."[108] "Second, subsection (2) [of K.S.A. § 59-2239] does not by its terms prohibit the use of relation back."[109] The court emphasized that its interpretation that subsection (2) did not forbid relation back was consistent "with Kansas cases that did not involve

[106] Fed. R. Civ. P. 15(c)(1)(C).

[107] No. 14-2396-JWL, 2015 WL 4642443, at *4 (D. Kan. Aug. 4, 2015).

[108] *Fed. Deposit Ins. Corp. v. Lindamood*, No. 14-2396-JWL, 2015 WL 4642443, at *4 (D. Kan. Aug. 4, 2015) (citing *Morel v. DaimlerChrysler AG*, 565 F.3d 20, 23–26 (1st Cir. 2009) (finding federal Rule 15(c) applies over more-restrictive state relation-back rules)).

[109] *Id.*

compliance with subsection (2), but in which courts have allowed the substitution of a decedent's estate to relate back to the date of original filing."[110]

The *Lindamood* court further explicitly determined that K.S.A. § 59-2239 permitted relation back where the plaintiff timely filed its original complaint but erroneously named the decedent, and then later amended its complaint to substitute a representative of the decedent's estate after the applicable statute of limitations had passed.[111] Moreover, Golubski's argument that *Lindamood's* consideration of Fed. R. Civ. P. 4(m) is a distinguishing fact is misplaced because the very nature of the Rule 15(c)(1)(C) analysis requires courts to determine whether the new defendant received notice within the Rule 4(m) period such that it suffers no prejudice. As such, the Court finds K.S.A. § 59-2239 does not bar relation back under Rule 15(c)(1)(C), which the Court turns to next.[112]

Under Rule 15(c)(1)(C), an amended complaint relates back to the date of the original complaint, including for the purposes of applying the applicable statute of limitations, when: (1) it arises from the same conduct as the original complaint; (2) the new defendant received notice within the Fed. R. Civ. P. 4(m) period such that it suffers no prejudice; and (3) the new defendant "knew or should have known the action would have been brought against it but for a mistake

---

[110] *Id.* at *5 (citing *Vorhees v. Baltazar*, 153 P.3d 1227 (Kan. 2007); *Hinds v. Estate of Huston*, 66 P.3d 925 (Kan. Ct. App. 2003)).

[111] *Id.* Notably, the *Lindamood* court also supported its conclusion with citation to *Vorhees*, which Golubski cites in support of his reading of K.S.A. § 59-2239(2). *Id.* at *5 (citing *Vorhees v. Baltazar*, 153 P.3d 1227 (Kan. 2007)).

[112] *Lindamood's* holding comports with how other courts have decided this issue. *See, e.g.*, *Metro. Paving Co. v. Int'l Union of Operating Eng'rs*, 439 F.2d 300, 306 (10th Cir. 1971) ("The fact that an applicable statute of limitations may have run before the real parties were substituted is not significant where the change is merely formal and in no way alters the known facts and issues on which the action is based."); *Shinkle v. Union City Body Co.*, 94 F.R.D. 631, 636 (D. Kan. 1982) (finding that the statute of limitations under K.S.A. § 60-1903 did not bar relation back under Fed. R. Civ. P. 15(c)); *Hoskinson v. High Gear Repair, Inc.*, No. 11-1190-JTM-DJW, 2013 WL 4028804, at *7 (D. Kan. Aug. 7, 2013) (finding (1) that K.S.A. § 60-1801 permitted relation back under Fed. R. Civ. P. 15 where plaintiff's appointment as special administrator occurred after the applicable limitations period had passed, and (2) that the Kansas Supreme Court has noted that relation back is permitted regardless of whether the party seeking to relate back is the defendant or the plaintiff).

concerning the proper party's identity."[113] First, Plaintiff's Amended Complaint simply substitutes Halderman in place of Matthew, and does not otherwise change claims or defenses arising out of the conduct as set out in his Original Complaint; as such, Plaintiff satisfies this element.[114]

Second, the Court finds Halderman received notice within the applicable Rule 4(m) period such that Golubski will not be prejudiced in defending the merits of this case.[115] Under Rule 4(m), a plaintiff must serve a defendant within 90 days after the complaint is filed, or else the court must either dismiss the action without prejudice or order service be made within a specified time.[116] Here, Plaintiff served Matthew, as the representative of Golubski's Estate, on November 19, 2025, 20 days after filing his Original Complaint, which was well within the 90-day deadline set by Rule 4(m).

On December 9, 2025, Matthew's counsel entered his appearance, represented Matthew through his dismissal, and stayed on as the counsel representing Halderman following her substitution. Consequently, because the same counsel represented Matthew on behalf of Golubski's Estate through his dismissal from this case and has likewise represented Halderman on behalf of Golubski's Estate from the moment she was named as Defendant, service on Matthew put Golubski's Estate on notice of this action, and Halderman took on that same notice when she was appointed as Special Administrator of that same Estate. Additionally, the Court finds allowing relation back under Rule 15 would not prejudice Golubski because Plaintiff has

---

[113] Fed. R. Civ. P. 15(c)(1)(C).

[114] *Fed. Deposit Ins. Corp. v. Lindamood*, No. 14-2396-JWL, 2015 WL 4642443, at *2 (D. Kan. Aug. 4, 2015) (finding that where an amended complaint merely substituted the party defendant, it did not alter the claims of the original complaint).

[115] The notice period of the rule includes any additional time from extensions ordered by the Court pursuant to Rule 4(m). *See* Fed. R. Civ. P. 15.

[116] Fed. R. Civ. P. 4(m).

met his burden under Rule 4(m) and Golubski has not otherwise identified any potential prejudice.[117]

Third, and finally, the Court finds that Halderman, as Special Administrator of Golubski's Estate, knew or should have known the action would have been brought against her but for a mistake concerning the proper party's identity. To start, neither party has indicated that Plaintiff first filed against Matthew as the representative of Golubski's Estate for any reason other than mistake.[118] Further, Plaintiff substituted Halderman in place of Matthew after Matthew moved to dismiss for lack of capacity to be sued, and Plaintiff worked with counsel, representing both Matthew and Halderman, to get Halderman appointed as the Administrator of Golubski's Estate. Indeed, Plaintiff informed the Court in his motion for leave to amend that "Special Administrator Daphne Halderman, who is now the court-appointed representative of the Estate of Roger Golubski, consents to the substitution Plaintiff seeks by way of this Motion."[119]

Thus, Plaintiff satisfies the final element, and the Court permits relation back under Rule 15(c)(1)(C). Therefore, because Plaintiff filed his Original Complaint on October 30, 2025, and the parties agree that Plaintiff's claim ran on December 11, 2025, Plaintiff filed his Amended Complaint on time as it relates back to the timely filing of his Original Complaint. Defendant's motion to dismiss Count VII is denied.[120]

---

[117] To the extent Golubski argues that notice occurred after the statute of limitations passed, the Court emphasizes that Fed. R. Civ. P. 15(c) only requires notice within the requirements of service, which may be extended beyond the running of the applicable statute of limitations. *See, e.g.*, *Fed. Deposit Ins. Corp. v. Lindamood*, No. 14-2396-JWL, 2015 WL 4642443, at *2 (D. Kan. Aug. 4, 2015).

[118] *See Anderson v. Deere & Co.*, 852 F.2d 1244, 1248 (10th Cir. 1988) (plaintiff sued wrong parties because of a "mistake" for purposes of Rule 15(c) where there was nothing to indicate that the plaintiffs were making a strategic or tactical choice).

[119] Doc. 47 ¶ 9.

[120] Golubski also argues in a footnote that K.S.A. § 59-2239(2) bars recovery of estate assets. However, K.S.A. § 59-2239(2) instead discusses the distribution of assets outside the liability context. Plaintiff further argues that the distribution of assets of an estate is irrelevant for the Rule 12(b)(6) inquiry. Golubski never addresses this in his reply.

### 2. Emotional Distress Claims Under Kansas Law (Counts VIII–IX)

Golubski argues that Plaintiff's state law claims alleging intentional and negligent infliction of emotional distress are barred by their applicable statute of limitations and repose. Specifically, Golubski argues that Plaintiff had until October 2020 at the latest, because all acts giving rise to his emotional distress claims occurred no later than October 2010 when he was convicted.

Under Kansas law, claims stemming from intentional and negligent infliction of emotional distress are subject to a statute of limitations of two years from the time the cause of action accrues.[121] Additionally, under Kansas law, the statute of repose states that "in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."[122] The Court addresses each proposed limitation in turn.

First, Plaintiff argues that because his cause of action is premised on his wrongful conviction, the correct reference date for the accrual of his cause of action is the date he was freed from prison: December 11, 2024. Plaintiff argues that this date is correct because he could not bring claims for intentional or negligent infliction of emotional distress due to wrongful arrest, prosecution, and imprisonment until after his convictions were declared illegal and vacated. Specifically, Plaintiff argues this is the correct procedural path, because "a cause of action accrues, so as to start the running of the statute of limitations, as soon as the right to maintain a legal action arises . . . [Therefore] an action accrues [when] the plaintiff could first have filed and prosecuted his action to a successful conclusion."[123] Thus, Plaintiff argues that

---

[121] K.S.A. § 60-513(a)(4); *see also Hallam v. Mercy Health Ctr. of Manhattan, Inc.*, 97 P.3d 492, 494 (Kan. 2004).

[122] K.S.A. § 60-513(b).

[123] *Pancake House, Inc. v. Redmond By & Through Redmond*, 716 P.2d 575, 579 (Kan. 1986); *see also*, *Lopez v. Davila*, 526 P.3d 674, 683–85 (Kan. Ct. App. 2023).

because he was released from prison on December 11, 2024, he had until December 11, 2026, to bring his claims. And that he filed his Original Complaint on October 30, 2025, and his Amended Complaint on March 13, 2026, both within the statute of limitations.

Golubski does not address Plaintiff's argument concerning when his cause of action accrued but instead asserts that his emotional distress claims are nonetheless barred by the statute of repose, which runs at a time unrelated to the traditional accrual of a cause of action. Statutes of repose are generally substantive and abolish a cause of action after a specific time period, even if the cause of action may not have accrued yet.[124] Unlike statutes of limitation which are measured from the time of injury or from the time the injury is discoverable, statutes of repose "run from defendant's last act giving rise to the claim or from substantial completion of some service rendered by defendant."[125] Consequently, Golubski argues that Plaintiff had until 10 years after his date of conviction to commence action, which Golubski contends is October 2020.

Plaintiff argues that the statute of repose is inapplicable because causation had not been established prior to his exoneration. As an initial matter, neither party has provided the Court authority on the applicability of Kansas's statute of repose in the context of emotional distress claims brought against an official who allegedly caused the wrongful arrest, prosecution, and imprisonment of a plaintiff lasting longer than the statute's ten-year outer limit. Nor has the Court found such authority. The Court therefore turns to general principles of Kansas law governing the application of the statute of repose.[126]

---

[124] *Harding v. K.C. Wall Products, Inc.*, 831 P.2d 958 (Kan. 1992).

[125] *Lowery v. Cnty. of Riley*, No. 04-3101-JTM, 2005 WL 1242376, at *3 (D. Kan. May 25, 2005) (citing *Menne v. Celotex Corp.*, 722 F. Supp. 662 (D. Kan. 1989)).

[126] When sitting in diversity, the Court is bound by "the latest holdings of the state's highest court." *United States v. Turley*, 878 F.3d 953, 957 (10th Cir. 2017). If that court provides no "definitive resolution of the legal issue," the Court must predict how it would rule. *Id.*

First, under Kanas law, In consideration of Kansas law, the accrual of a cause of action is irrelevant to the statute of repose inquiry, because the statute of repose can operate to abolish a cause of action prior to its accrual.[127] Thus, the correct question is at which point did Golubski render his "last act giving rise to the claim or from substantial completion of some service rendered [by Golubski]."[128] And on this question, Plaintiff neither provides an answer, nor alleges facts establishing at which point Golubski rendered his last act giving rise to Plaintiff's arrest, conviction, and imprisonment.

Thus, taking the most recent allegation of Golubski's involvement, which is Plaintiff's October 2010 conviction, Plaintiff had until October 2020 under the Kansas statute of repose to file suit. Because Plaintiff did not file his Original Complaint until October 2025, "[t]he statute [of repose], as well as the harsh outcome that a statute of repose creates," bars Plaintiff's emotional distress claims under Kansas law.[129] And, because the Court finds Plaintiff's negligent infliction of emotional distress claim is barred under the statute of repose, the Court does not reach the question of whether Plaintiff adequately alleges a physical injury under that claim.[130] In sum, Golubski's motion to dismiss Counts VIII–IX is granted.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Dismiss (Doc. 57) is **granted in part** and **denied in part**. Plaintiff's claims for negligent and intentional infliction of emotional distress (Counts VIII–IX) are **dismissed**. Defendant's motion to dismiss is otherwise **denied**.

**IT IS SO ORDERED.**

---

[127] *Harding v. K.C. Wall Prods., Inc.*, 831 P.2d 958 (Kan. 1992).

[128] *Menne v. Celotex Corp.*, 722 F. Supp. 662, 666 (D. Kan. 1989).

[129] *Holmes v. Boal*, No. CIV.A. 04-2591-CM, 2005 WL 2122315, at *6 (D. Kan. Aug. 22, 2005).

[130] *Roberts v. U.S. Dep't of Veterans Affs.*, No. 20-CV-01358-JAR-KGG, 2021 WL 1426767, at *4 (D. Kan. 2021) ("It is fundamental that federal courts do not render advisory opinions and that they are limited to deciding issues in actual cases and controversies.").

Dated: August 19, 2026

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE